IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

RENEE SCOTT,                           )
                                       )
                    Plaintiff,         )
                                       )
          vs.                          )          No. CIV-04-863-C
                                       )
CITY OF MINCO, et al.,                 )
                                       )
                    Defendants.        )

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants' Motion for Summary Judgment (Dkt. No. 50). Plaintiff filed this action asserting claims of gender discrimination and retaliation against her prior employer.  Defendants contend that the undisputed evidence demonstrates that they are entitled to summary judgment pursuant to Fed. R. Civ. P. 56.  Defendants' motion is granted in part and denied in part.

### STANDARD OF REVIEW

Summary judgment is proper only if the moving party shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim."  See Adler v. Wal Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."  Id. (citing Anderson, 477 U.S. at 248). At

the summary judgment stage, the Court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. Willis v. Midland Risk Ins. Co., 42 F.3d 607, 611 (10th Cir. 1994).

When deciding whether summary judgment is appropriate, the Court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. See Anderson, 477 U.S. at 255; Simms v. Oklahoma ex rel. Dep't of Mental Health, 165 F.3d 1321, 1326 (10th Cir. 1999). The Court may consider as evidence the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." Fed. R. Civ. P. 56(c). Although the evidence need not be produced "'in a *form* that would be admissible at trial,' . . . the content or substance of the evidence must be admissible." Thomas v. Int'l Bus. Machs., 48 F.3d 478, 485 (10th Cir. 1995) (quoting Celotex Corp., 477 U.S. at 324). The Court will not consider unsupported, conclusory allegations. See Harrison v. Wahatoyas, L.L.C., 253 F.3d 552, 558 (10th Cir. 2001).

BACKGROUND

Plaintiff, Renee Scott (Scott), is a female former police officer with Defendant, City of Minco (City). The City of Minco is governed by a City Council. (Undisputed Fact ¶ 1.) According to Mayor Denard, the City had fewer than fifteen employees during 2002-2004.[1] (Denard Aff., Defs.' Exh. B, ¶ 3.) In addition to the police officers, water plant worker, and

---

[1] Scott disputes this conclusion. Scott's evidence and arguments are discussed in detail in the section, Title VII claims, infra.

utility clerk, who were paid as employees, the City also paid an attorney and a judge a flat fee of $350 per month to work on contract.  (Denard Dep., Pl.'s Exh. 27, at 142-144.)

During 2002-2004, the City also had at least fourteen members of the volunteer fire department.  (Hurley Dep., Pl.'s Exh. 49, at 9.)  The City contributed $60 per year to the Oklahoma Firefighters Pension System for each volunteer firefighter.  (Invoice for Active Volunteer Contributions, Pl.'s Exh. 30.)  Volunteer firefighters would qualify for retirement benefits from this fund if, at age 50, they had completed at least ten years of service.  11 Okla. Stat. § 49-101.  Additionally, if a firefighter was killed in the line of duty, the firefighter's family could receive a $5,000 death benefit, 11 Okla. Stat. § 49-113.2, and a tuition waiver for the firefighter's children to attend an Oklahoma public university.  70 Okla. Stat. § 3218.7.  Finally, the volunteer firefighters were provided other benefits under state law, such as a tax credit and opportunity to purchase a firefighter's license tag.  See 47 Okla. Stat. § 1136(25); 69 Okla. Stat. § 2358.7.[2]

Scott began working with the City as a reserve police officer in January 2002.  (Defs.' Br., Dkt. No. 51, Undisputed Fact ¶ 3; Pl.'s Resp., Dkt. No. 57, Pl.'s Dep., Exh. 28, at 7.)  In early 2003, Scott was hired by then-chief of police, Neal Locke, to work full time in the Cops in School Program (school resource program), a position funded by the federal government.  (Undisputed Fact ¶ 3; Pl.'s Dep. at 9.)  At the time of her promotion to this

_____

[2]  The majority of Scott's evidence regarding benefits received by the firefighters has not been authenticated and is hearsay, evidence to which Defendants object.  Thus, this factual recitation is derived primarily from the Oklahoma statutes detailing benefits provided to active volunteer firefighters and any additional benefits described in the admissible deposition testimony of the fire chief.

position, Scott was not certified by the Oklahoma Council on Law Enforcement (CLEET). (Undisputed Fact ¶ 3.)

In April and May 2003, things began to look promising for Scott's career as a police officer. Gus Handke, then a police officer, ran against Chief Locke for his position and won. (Undisputed Fact ¶ 1; Pl.'s Dep. at 35.) After Handke took over as chief of police, Scott was moved from the school program and assumed the duties of a regular patrol officer. (Pl.'s Dep. at 11-12.) Additionally, Handke began promising her a promotion to the position of lieutenant, although Scott was still only CLEET certified as a reserve officer. (Pl.'s Dep. at 16, 21, 24-25.) Specifically, Handke told Scott to "pick up [her] lieutenant bars" while at a police supply store. (Id.)

However, things began to quickly deteriorate. Handke told Scott that he could not promote her to lieutenant because he was concerned that the "guys . . . would give [her] a hard time if they had to answer to [her]." (Pl.'s Dep. at 27.) In May 2003, Handke left a handwritten note for Plaintiff stating: "Get that stolen check report done dumb-dumb. Fax the stuff to C.P.D. I don't care if you have to go harass the people. Just get the check number if nothing else. Your Father." (Handwritten Note, Defs.' Exh. A(5).)

Handke began making negative comments about women in general and Scott in particular. In May 2003, he allegedly told Scott that he "had problems with women, but . . . don't worry about it because it's not you" and "all women do is whine and complain and throw temper tantrums." (Pl.'s Dep. at 102.) When asked how his new female officer was working out, Handke replied that he didn't "know that women should be in law

enforcement. . . .   They should be at home, pregnant, barefoot and cooking for him." (A. Smith Dep., Exh. 44, at 6.) Handke told Scott that because she was a woman, he had to work her harder and watch her more closely. (Pl.'s Dep. at 98.) On one occasion, Scott called Handke to ask him a question and he allegedly told her to "make it quick because I don't have time for this women [sic] bullshit." (Pl.'s Dep. at 101.) Handke also explained to Scott why he didn't joke with her like he did with the others: "You have to understand, there are certain things you don't discuss around women. There are things that I won't talk about around my mom or my girlfriend out of respect for them." (Undisputed Fact ¶ 45.) When confronted by Neal Locke about the problems between Handke and Scott, Handke told Locke that "women just don't belong here [in the police department]." (Locke Aff., Pl.'s Exh. 52, ¶ 8.)

The trouble between Handke and Scott extended beyond discriminatory comments. Handke twice batted at Scott's ponytail, causing it to come undone. (Pl.'s Dep. at 103-106.) Although Plaintiff had been the first to request to attend a particular CLEET training on meth labs, Handke permitted two male officers, Daniel Smith and Chris Smith, to instead attend the class. (Undisputed Fact ¶ 20; Pl.'s Dep. at 114-15.) Handke allegedly told his cousin, Adam Wright, to record any conversation with Scott. (Pl.'s Dep. at 168.) According to Scott, Handke scheduled her so that she only had one day off at a time, while the other (male) officers had two or three days off in a row. (Pl.'s Dep. at 125.) Scott also asserts that, despite being the most senior officer, she was forced to drive the oldest car. (Pl.'s Dep. at 97.) According to a co-worker, "Chief Hanke [sic] was always on her case about something,

5

you know, that she was always doing something wrong, even though, in my mind, she was always just following, you know, the guidelines of her job and doing her job." (Ferrell Dep., Exh. 29, at 6.)

In November 2003, Plaintiff attended CLEET basic academy and received her CLEET certification. (Undisputed Fact ¶ 13.) After receiving this certification, Plaintiff requested a retroactive pay raise, which was approved by the City. (Undisputed Fact ¶ 14.) Handke, however, disagreed with the decision to give Scott back pay. In a memo to Scott, Handke explains, "You asked the city for back pay, that in my opinion you did not deserve. I explained to you that I felt you deserved some back pay but not the amount of which you received." (March 11, 2004, Memo, Pl.'s Exh. 33.)

In March 2004, she enrolled in a CLEET course for field sobriety and informed Handke of her enrollment. (Undisputed Fact ¶ 21.) The next day, Handke issued a memo to all officers indicating that "C.L.E.E.T. training must be pre-approved . . . [a]ny officer who has enrolled in any schools and not made me aware of that enrollment, will withdrawal [sic] from said class(es)." (March 30, 2004, memo, Pl.'s Exh. 40.) Apparently interpreting the memo as directed to her, Scott did not attend the class without notifying the registrar that she would not be attending. (Undisputed Fact ¶ 24.)

Handke had trouble with another female officer, Valerie Easley (Easley). Easley worked for the City from August 2003 to January 2004 in the school resource program (Easley Dep., Pl.'s Exh. 51, at 5-6, 9.) According to Easley, Handke told her that one reason she was hired was because it looked better to have a female in the school resource officer

6

position. (Easley Dep. at 9.) When Easley inquired about advancement, Handke told her to forget it because "no woman is ever going to advance here." (Easley Dep. at 10.) When Easley requested permission to attend a CLEET class, Handke denied her request and instead permitted a male officer to attend the course. (Easley Dep. at 17-18.) Handke told her that the class isn't "going to do you any good anyway . . . . You're not going to go anywhere anyway in this department. No female is going to go anywhere in this department." (Easley Dep. at 18.)

By the spring of 2004, Scott talked with then-mayor Schutten and city council members about her problems with Handke. (Schutten Dep., Pl.'s Exh. 32, at 33; Pl.'s Dep. at 162-64.) In addition to complaining about the harassment, Scott asserted that Handke had given minors permission to drink alcohol, so long as they went outside the city limits to do so. (Pl.'s Dep. at 163-64.) The city council members advised her to "write it all down" and present it formally to the City Council at the upcoming meeting. (Pl.'s Dep. at 164.)

Shortly after Scott made these complaints, Handke issued a memo to Scott expressing his displeasure for her "blatant lack of respect for our chain of command structure." (March 11 memo, Pl.'s Exh. 33.) Handke commanded Scott "not [to] go outside of the chain of command to complain." (Id.) On April 9, Handke tape-recorded a confrontation with Scott regarding her handling of an arrest. (Undisputed Fact ¶ 24.) The conversation escalated and Scott apparently attempted to call the mayor. (Tr. of Handke & Scott Conversation, Pl.'s Exh. 24, at 9.) Handke demanded Scott put the phone down, telling her that the mayor "has

7

nothing to do with my police department.  I run the police department here," and ultimately suspended Scott.  (Id. at 9-10.)

Scott took her complaints to the City Council.  Scott presented a packet which included her complaints about gender discrimination and of what she perceived as Handke's dereliction of duty.  (Packet, Pl.'s Exh. 9.)  Scott again accused Handke of giving Minco minors permission to drink alcohol so long as they did it outside the city limits.  (Id.)  Scott further accused Handke of failing to arrest juveniles he observed smoking marijuana, and of destroying evidence.   (Id.)   Indeed, Scott produces the police report, in which Handke himself states he:

> observed several individuals sitting in the living room smoking marijuana and drinking from cups that contained beer. . . . Most of the individuals at the residence were at least eighteen years of age or older.  There were three juveniles at the residence. . . .  Those of age (21 or older) were cited for supplying an alcoholic beverage to minors and those not of age (under 21) were cited for possession of alcohol under the age of twenty-one.
>
> . . . I drained the keg of Bud-Light and left the empty container at the residence.  Marijuana at the residence was also disposed of.

(Id.)  At a City Council meeting on April 12, 2004, Scott presented this packet of complaints, which was considered by the council members and the new mayor, Doug Denard, in executive session.  (Denard Dep., Pl.'s Exh. 42-44, at 42-46.)  Although Denard agrees that the allegations about Handke are concerning and would constitute dereliction of duty, the City took no action.  (Denard Dep. at 49, 53-54.)  Indeed, Denard still has no plans to take any action against Handke regarding these complaints.  (Denard Dep. at 113.)

Handke and Denard discussed Handke's problems with Scott and female officers in general.  (See Keeble Dep., Pl.'s Exh. 37.)  The city clerk overheard Handke tell Denard, "I don't think women should be in law enforcement," and Denard responding, "I agree." (Id. at 73.)  On several occasions, Handke and Denard discussed Scott's work performance and the problems she was having.  (Handke Dep., Pl.'s Exh. 26, at 21-26, 66-68; Denard Dep., Pl.'s Exh. 27, at 68-69.)

Scott had trouble with more than just Handke.  During the time she was employed with the City, the City received numerous oral and written complaints about Handke's attitude and behavior as a police officer.  (Undisputed Fact ¶ 15.)  Although Scott disputes the underlying factual allegations of the complaints and contends that all officers receive complaints, she does not dispute that the complaints were actually made.  After making an arrest in June 2004, Scott failed to file a probable cause affidavit or seek a probable cause order from a judge.  (Undisputed Fact ¶ 26.)  Scott, instead, had the city clerk contact the judge's chambers to have the suspect arraigned.  (Keeble Dep. at 52-53.)  Although this was quite unusual, the city clerk called the judge's office and left a message with the secretary. (Keeble Dep. at 54, 56.)  However, the suspect was not released and was held in jail for four days until released by the judge.  (Handke Aff. ¶ 26; Court Minutes, Defs.' Exh. A(8).)

In August 2004, Scott learned that a known felon, Lance Conner, had threatened to cut the brake lines on a fellow officer's car.  (Undisputed Fact ¶ 31; Pl.'s Dep. at 67.) However, Scott did not relay this threat to the officer or Handke because she was more concerned with the fact that Conner had also threatened to "take [her] out." (Pl.'s Dep. at 68-

9

69.)  It was days later when she finally discussed the threat against the other officer with him. (Pl.'s Dep. at 69.)

In 2004, Scott purchased a .32 firearm as a backup weapon.  (Undisputed Fact ¶ 35.) She submitted a purchase order to the City Council for payment of the gun.  (Id.)  After approval by the City Council, the City issued a check for $273.96 to pay for the gun.  (See Check, Pl.'s Exh. 23; Denard Dep. at 116.)  However, shortly thereafter, Mayor Denard challenged whether the gun purchase was an appropriate expenditure for officers under their uniform and equipment allowance.  (Denard Dep. at 134.)  The City then demanded that Scott repay the $273.96.  (Id.)  Denard testified that about this time, he began thinking about terminating Scott.  (Denard Dep. at 13-14.)

Full-time officers with the City are allowed $700 per year for "uniform and equipment."  (Undisputed Fact ¶ 56.)  An officer wishing to use this allowance to purchase work-related merchandise selects the items from an approved vendor and then submits a purchase request with the City.  (Balke Dep., Pl.'s Exh. 34, at 55.)  The City Council then votes on whether to approve the purchase request and, if approved, submits a check to the vendor.  (Undisputed Fact ¶ 56.)

There was no written policy identifying what items could or could not be purchased with this allowance.  (Denard Dep. at 30.)  Under Chief Locke, officers were simply given a certain amount of money and were permitted to buy whatever work-related supplies they needed with that money.  (Pl.'s Dep. at 79; Blevins Dep. at 20.)  Apparently, previous

officers had used their allowances to purchase firearms.  (See Pl.'s Dep. at 80; Blevins Dep. at 21.)[3]

After Scott purchased her weapon, however, Denard contends that he verbally instructed Scott regarding the items for which she could use her allowance.  (Denard Dep. at 30.)  Specifically, Denard indicated the allowance could only be used for uniform shirts, pants, boots, jackets, belts, handcuff casings, handcuff holders, magazine carriers, and gun holsters.  (Denard Dep. at 57-58.)  Denard asserts that he verbally relayed this list to both the city clerk and Chief Handke.  (Denard Dep. at 30.)  Scott denies, however, that Denard ever told her what she could purchase with her allowance.  (Scott Aff., Pl.'s Exh. 43, ¶ 12.)

Scott was not the only police officer who ran into trouble with the uniform and equipment allowance.  In his deposition, Denard reviewed the purchases by other officers and agreed that those officers had purchased items that were not on Denard's "approved" list.  (Denard Dep. at 61-64.)  Those officers were not subject to any disciplinary action for their unauthorized expenditures.  (Denard Dep. at 63, 65.)  Three officers, including Chief Handke, overspent on their allowances but were not subject to discipline.  (Denard Dep. at 35-36, 62-63; Daniel Smith Uniform Expense, Pl.'s Exh. 19; Chris Ferrell Uniform Expense,

---

[3] Defendants object to this deposition testimony as hearsay.  Although the testimony by Scott is clearly hearsay if offered for the truth – that other officers had used their allowances to purchase firearms – it is not hearsay if offered to demonstrate Scott's understanding of whether she could purchase the weapon.  In contrast, the testimony of Blevins does not appear to be hearsay, even if offered for the truth.  Blevins did not testify that he *heard* that others had purchased weapons, but that he *knew* of another officer who had purchased a weapon using his allowance, specifically a Glock Model 22.  (Blevins Dep. at 21.)

Pl.'s Exh. 20.)  In fact, Denard wrote a personal check to reimburse the City for the excess

spending of one officer.  (Denard Dep. at 119.)

In December 2004, Scott made several more purchases on her allowance.  (Pl.'s Dep.

at 134-35.) Specifically, Scott purchased a duffel bag to carry her "forms holder, ticket book,

gloves, extra handcuffs, . . . emergency kit, . . . extra flashlight" and a shirt to wear under her

uniform, a drug guide, and a can of Mace.  (Pl.'s Dep. at 135-38.)  Denard learned of these

purchases and decided to fire Scott.  (Denard Dep. at 11.)

Denard fired Scott on December 31, 2004.  (Denard Dep. at 10.)  Denard proffers

twenty-one reasons for his decision to fire Scott, the first of which is "irregularities in

clothing allowance."  (Denard Aff., Defs.' Exh. B, ¶ 19.)  However, the only reason he gave

Scott when she was fired was that she had abused her uniform and equipment allowance.

(Denard Dep. at 20; Pl.'s Dep. at 138.)  Denard did not thereafter notify Scott of the other

supposed reasons for terminating her, nor did Denard give any of these reasons to the City

Council when considering Scott's appeal.  (Denard Dep. at 21-27.)

Scott appealed her termination to the City Council.  (Denard Dep. at 20.)  Scott

attempted to persuade the City that she was unaware that the purchase was wrong.  (Pl.'s

Dep. at 146.)  Several citizens appeared at the hearing and spoke out both for and against

Scott's termination.  (City Council Minutes Jan. 10, 2005, Defs.' Exh. B(5).)  According to

one council member, the mayor's reasoning for firing Scott stemmed from the fact that Scott

and Handke were "getting into it."  (Brown Dep., Pl.'s Exh. 54, at 9.)  Another council

member opined that "the city was going to be in a lawsuit no matter if it was this issue or the

next issue, with her. . . .   She always has a problem with something, so we might as well go ahead and uphold the termination."  (Baade Dep., Pl.'s Exh. 35, at 133, 142-43.)  After discussing the termination in executive session, the City Council voted 6 to 2 in favor of her termination.  (Id.)  The City Council also voted to approve Scott's questionable purchases at this meeting.  (Denard Dep. at 33.)

DISCUSSION

Scott has asserted claims of gender discrimination and retaliation under Title VII, 42 U.S.C. § 2000e, et seq., and violations of her First and Fourteenth Amendment rights under 28 U.S.C. § 1983.  The City claims that it is entitled to summary judgment on Scott's Title VII claims because it does not have fifteen or more employees.  Defendants assert also that Scott has failed to plead an Equal Protection claim because she did not suffer an adverse employment action and she has insufficient evidence to demonstrate that she was terminated because of her gender.  Defendants also challenge her First Amendment retaliation claim, arguing that she did not speak out on a matter of public concern, and, even if she did, there is insufficient evidence demonstrating a causal connection between her protected speech and her termination.  Finally, Defendants argue that Scott has not presented sufficient evidence that Denard and Handke personally participated in any alleged deprivation of Scott's rights and thus they are entitled to qualified immunity.  The Court addresses the claims separately below.

Title VII Claims

13

Title VII forbids an employer to discriminate against an employee on the basis of gender or because the employee has opposed gender discrimination. 42 U.S.C. § 2000e-2(a)-2000e-3(a). An "employer" for purposes of Title VII is "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 2000e(b). An employee is "an individual employed by an employer, except that the term 'employee' shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof." 42 U.S.C. § 2000e(f).

The fifteen employee limitation in Title VII is jurisdictional. Owens v. Rush, 636 F.2d 283, 287 (10th Cir. 1980). Although the Court must construe the reach of this statute broadly to effectuate its remedial purposes, id., the Court is also mindful not to read out the jurisdictional limitation altogether as it reflects the balance struck by Congress between the "goals of eradicating discrimination and protecting small enterprises from the hardship of litigating discrimination lawsuits." Stephens v. Kay Mgmt. Co., Inc., 907 F. Supp. 169, 172 (E.D. Va 1995).

According to Mayor Denard, the City has less than fifteen employees. Scott first attempts to dispute this allegation by attaching a document entitled "Oklahoma Municipal Assurance Group," which contains both typed and handwritten information about the payment of workers' compensation insurance for volunteers and employees with the City during the years 2002 and 2003. Defendants object to this document on both authenticity and hearsay grounds. Scott's only response to this objection is that the document was produced

14

in discovery by the City and, thus, the Court should consider it authentic pursuant to <u>Chavez</u> <u>v. Thomas & Betts Corp.</u>, 396 F.3d 1088, 1101 (10th Cir. 2005). <u>Chavez</u> is not applicable, however, because, in <u>Chavez</u> the document at issue was on the defendant company's letterhead and was produced by the defendant in discovery. <u>Id.</u> Thus, the trial court found that the circumstantial evidence was sufficient to authenticate the document. <u>Id.</u> In contrast, this document bears the heading "Oklahoma Municipal Assurance Group" and contains *handwritten* statements on it, the authenticity and truth of which are critical and easily could have been established through an affidavit from the record's custodian. Because Scott has not demonstrated that the document is or will be admissible for its truth (or any purpose), the Court cannot consider it.

Even if Scott could overcome the authenticity and hearsay objections, the exhibit alone would be insufficient to raise a jury question regarding the number of employees employed by the City of Minco in the years in question. Scott must demonstrate that the City had fifteen or more employees for a minimum of twenty weeks during either 2003 or 2004. <u>See</u> 42 U.S.C. § 2000e(b). This document, while allegedly giving a total number of persons paid during the year 2003, does not indicate how many weeks each employee was on the payroll during the year or whether these persons were employees or individual contractors. <u>See</u> <u>Walters v. Metro. Educ. Enters., Inc.</u>, 519 U.S. 202, 212 (1997) (stating that all that is required to determine if a defendant is an employer is to look to see if more than fifteen persons appeared on payroll for twenty or more weeks in a relevant year and then determine whether those individuals are "employees" under traditional agency principles). The

document merely indicates that twelve persons were paid in 2002 for a total payroll of

$204,820 (including one attorney for $3,300 and two cemetery drivers for a total of $3,000).

In contrast, twenty persons were allegedly paid in 2003 for a total of $228,995.19.  The

document does not give any information about 2004.  Clearly, standing alone, no reasonable

juror could conclude that this document establishes that the City had an employment

relationship with fifteen or more persons for at least twenty weeks in either 2003 or 2004.[4]

Scott also claims she has met this jurisdictional prerequisite by pointing out that, in

addition to the paid employees, the City had at least fourteen volunteer firefighters during

the relevant years.  Therefore, whether the City is an employer for purposes of Title VII

depends on whether the volunteer firefighters are "employees."

To determine whether someone is an employee, the Court must consider the totality

of the circumstances.  See Ferroni v. Teamsters, Chauffeurs & Warehousemen, 297 F.3d

1146, 1152 (10th Cir. 2002).  In the Tenth Circuit, courts use the "hybrid test" to perform this

analysis.  Zinn v. McKune, 143 F.3d 1353, 1357 (10th Cir. 1998).  Specifically, the Court

looks to:

> (1) the kind of occupation at issue, with reference to whether the work usually
> is done under the direction of a supervisor or is done by a specialist without
> supervision; (2) the skill required in the particular occupation; (3) whether the
> employer or the employee furnishes the equipment used and the place of work;
> (4) the length of time the individual has worked; (5) the method of payment,
> whether by time or by job; (6) the manner in which the work relationship is
> terminated; (7) whether annual leave is afforded; (8) whether the work is an

---

[4] Notably, Scott has made no attempt to argue to the contrary.  Scott merely attaches the
document and devotes her argument to whether the City's firefighters were employees.

integral part of the business of the employer; (9) whether the worker accumulates retirement benefits; (10) whether the employer pays social security taxes; and (11) the intention of the parties.

Id. (quoting Lambertsen v. Utah Dep't of Corrections, 79 F.3d 1024, 1028 (10th Cir. 1996)). Ultimately, it appears that whether an employer-employee relationship exists depends on the extent to which compensation is exchanged for services – i.e., the "employee" derives a financial benefit from the "employer," and the "employer" exercises "'control [over] the 'means and manner' of the worker's performance.'"   See id.; Graves v. Women's Prof'l Rodeo Ass'n, Inc., 907 F.2d 71, 73 (8th Cir. 1990).

Although the Court recognizes that compensation *could* encompass more than merely wages or a salary, the financial "benefits" provided here simply are not significant enough to rise to the level of compensation.  The line-of-duty benefits, although not completely irrelevant, are of no benefit to the firefighter unless injured or killed on the job.  The chief financial benefits, therefore, are the tax credit and the pension benefit available through the Oklahoma State Firefighters Association.  The tax credit, however, is not available to all volunteer firefighters, but only to those who have achieved certain certifications and completed a specified amount of continuing education.  The largest tax credit a firefighter may claim is $400 per year.  To receive any pension benefit, a firefighter must volunteer a minimum of ten years.  Here, there is no evidence on either point.  When compared to the type of remuneration ordinarily derived from an employment relationship, the benefits received by the City's volunteer firefighters are simply too minor to rise to a level that can be characterized as compensation.  See Tawes v. Frankford Volunteer Fire Co., ___

17

F. Supp. 2d ___, 2005 WL 83784 (D. Del. Jan. 13, 2005) (reaching a similar conclusion); Keller v. Niskayuna Consol. Fire Dist. 1, 51 F. Supp. 2d 223, 232 (N.D.N.Y. 1999) (benefits received were not significant enough and were not received in an "ongoing, roughly contemporaneous fashion" to be considered compensation for services).

The Court recognizes that this conclusion is contrary to that reached by the Fourth Circuit in Haavistola v. Cmty. Fire Co., 6 F.3d 211, 222 (4th Cir. 1993) (finding that whether similar benefits were compensation sufficient to make volunteer firefighters receiving such compensation "employees" under Title VII was a question of fact best presented to the jury). However, the conclusion reached today is more consistent with Tenth Circuit precedent, see Ferroni, 297 F.3d at 1152 (holding that shop stewards who received *payment* for lost time insufficient to count them as employees under Title VII), and Congress's concern for "protecting small enterprises from the hardship of litigating discrimination lawsuits." Stephens, 907 F. Supp. at 172.

Even if the benefits received by the firefighters were construed as compensation, the Court could not find the firefighters were employees. Scott has not presented any evidence indicating what control, if any, that the City played in directing the activities and work performance of the firefighters. Thus, under the totality of the circumstances, no reasonable jury could find that the firefighters were employees of the City. Defendants are entitled to summary judgment on Scott's Title VII claims.

Section 1983 Claims

*Equal Protection Claim*

18

Scott claims that Defendants violated her Fourteenth Amendment right to equal protection under the law by terminating her because of her gender.  Scott is not seeking redress under § 1983 for a hostile work environment.  (Pl.'s Resp. at 20.)  Handke contends that he is entitled to judgment on Scott's equal protection claim because there is no evidence that he played a role in Scott's termination.  Denard and the City claim that they are entitled to judgment because Scott has not presented any evidence that they were motivated to terminate her because of her gender.  Both arguments fail.

There does not appear to be any real dispute that Scott has presented a prima facie case of discrimination.  Scott is a female and was qualified to serve as a police officer.  Despite her qualifications, she was terminated and the job was not eliminated after her discharge.  See Baca v. Sklar, 398 F.3d 1210, 1218 n. 3 (10th Cir. 2005) (stating that the elements for a plaintiff's prima facie case in a discrimination suit are the same whether brought under Title VII or § 1983).

At the time of Scott's termination, Defendants proffered a legitimate, non-discriminatory reason for her termination – improper use of her uniform and equipment allowance.  Since then, Defendants have offered twenty more reasons for her termination. (See Denard Aff. ¶ 19.)

Having set forth these reasons, the burden shifts back to Scott to demonstrate that the reasons proffered are pretextual.  Scott can meet this burden by submitting sufficient evidence from which a reasonable jury may infer that Defendants' proffered reasons for her termination are unworthy of belief.  Pretext is commonly shown through evidence that:

(1) an employer's stated reason for the adverse action was false; (2) the employer acted contrary to a written company policy; or (3) the employer treated the plaintiff differently than other similarly-situated employees who violated comparably severe work rules.  Kendrick v. Penske Transp. Servs. Inc., 220 F.3d 1220, 1230 (10th Cir. 2000).

Scott has more than met her burden of demonstrating pretext.  The mere fact that Denard has offered an additional twenty reasons "after the fact" of Scott's firing supports an inference of pretext.  See Plotke v. White, 405 F.3d 1092 (slip opinion at *24 ) (10th Cir. Apr. 28, 2005) (post-hoc reasons for termination constitute evidence of pretext); McGarry v. Bd. of County Comm'rs, 175 F.3d 1193, 1200 (10th Cir. 1999) (stating that a change of story tends to show pretext).  A reasonable jury may also find that Scott's duffel bag purchase was not the reason for her termination.  First, the purchase request had not yet been approved at the time of Scott's termination.  Thus, no city funds had been expended on this "improper purchase."  Second, there was no written policy regarding what could or could not be purchased with the allowance.  See Conner v. Fort Gordon Bus Co., 761 F.2d 1495, 1500 (11th Cir. 1985) ("use of unannounced policies . . . will tend to support a plaintiff's claim of pretext").  Third, even if Scott's purchase was contrary to Denard's verbal policy (of which she denies ever learning), similarly-situated employees had committed similar or worse infractions by purchasing "unauthorized" items or overspending their allowances altogether and these employees were not disciplined, much less terminated.  See Kendrick, 220 F.3d at 1230 (stating that pretext may be shown through evidence that the plaintiff was treated differently than "similarly-situated employees who violated work rules of comparable

seriousness"). Indeed, on one occasion, Denard personally covered an employee's overage. Finally, Scott has presented a host of witnesses testifying that Handke explicitly stated that women didn't belong in law enforcement. See id. at 1230 n. 10 ("direct evidence of discrimination is also adequate to create a genuine dispute regarding pretext."). At least one of these statements was in direct reference to Scott. (A. Smith Dep. at 6.) "Gender-based comments by a plaintiff's supervisor can be relevant evidence of pretext demonstrating that the supervisor had 'preconceived notions premised on [the plaintiff's] gender' . . . even where such comments were not directly limited to the termination decision." Plotke, 405 F.3d at __, (slip opinion at *33). The city manager asserts that she overheard Handke share this sentiment with Denard, who agreed. At least one city council member testified that he understood that Scott was terminated because she and Handke kept "getting into it." In short, Scott has met her burden of demonstrating pretext.

The question remains, however, whether Handke may be personally liable under § 1983 for Scott's equal protection claim. Unlike Denard and the City, Handke neither made the decision to fire Scott nor affirmed her termination. Indeed, Handke was without the authority to do so. See 11 Okla. Stat. § 9-105(3), 9-118 (stating that the mayor has the power to remove employees and the employee may appeal that decision to the city council). However, Scott has presented evidence that Handke "caused" her termination. See Wulf v. City of Wichita, 883 F.2d 842, 864 (10th Cir. 1989) (holding that sheriff who recommended police officer's termination "caused" his termination and could be personally liable under § 1983). First, Scott has presented evidence that Handke was quite vocal about women not

21

belonging in law enforcement.  Second, shortly after Scott made her initial complaint about Handke to then-mayor Schutten, Handke warned Scott not to go "outside the chain of command."  Then, when Scott threatened to get Schutten on the phone during a dispute, Handke suspended her and declared his authority over what happened in the police department.[5]  Third, when asked in his deposition about his role in Scott's termination, Handke was quite evasive and stopped short of denying that he recommended her dismissal. For instance, when asked whether he heard Denard testify that Handke "did not directly provide any input or information related to the termination of Renee Scott," Handke replied, "according to him."  (Handke Dep. at 20.)  In his deposition, Handke was repeatedly asked whether he recommended Scott for firing and, although avoiding a yes or no answer, Handke admitted giving "input" to Denard prior to his decision.  (See, e.g., Handke Dep. at 23-24.) A reasonable juror could find that Handke "caused" Scott's termination by setting in motion "a series of events that [he] knew or should reasonably have known would cause others to deprive the plaintiff of her constitutional rights."  Wulf, 883 F.2d at 864 (quoting Conner v. Reinhard, 847 F.2d 384, 397 (7th Cir. 1988)).

Because Scott has presented sufficient evidence from which a reasonable juror could find that Handke, Denard, and the City deprived her of her right to equal protection of the laws, Defendants are not entitled to summary judgment on this claim.[6]

---

[5]  This suspension was apparently overturned by Schutten.

[6]  Although Defendants make an argument under the heading "qualified immunity," they do not make a qualified immunity claim.  They merely argue that Scott has not presented sufficient evidence that Handke or Denard personally participated in the deprivation of Scott's constitutional

*First Amendment Retaliation Claim*

Scott also asserts that the City, Denard, and Handke violated her First Amendment right to free speech by terminating her for speaking out about Handke's alleged gender harassment and expressing her concerns about his "dereliction of duty."   Defendants challenge Scott's claim on three grounds:  (1) Scott has not demonstrated that she engaged in protected speech; (2) Scott's interest in making the statements is outweighed by their legitimate concern in regulating Scott's speech; and (3) Scott cannot demonstrate that her speech was a motivating factor for her termination because of the length of time between her protected speech and her termination.

Statements by public employees relating to matters of public concern, even where directed at their employer, are protected by the First Amendment.  Baca, 398 at 1218.  To move forward with her First Amendment claim, Scott must demonstrate:  "(1) the speech in question involves a matter of public concern; (2) [her] interest in engaging in the speech outweighs the government employer's interest in regulating it; and (3) that the speech was a substantial motivating factor" behind the decision to fire her.  Id. at 1218-19.

Although contending that Scott's complaints about harassment are not a matter of public concern, Defendants seem to concede that Scott's complaint about Handke condoning

---

rights.  (See Defs.' Reply, Dkt. No. 74, at 8.)   As correctly noted by Defendants, personal participation is an element of Scott's claim against these individuals under § 1983 – an element previously addressed.  It is not a part of the qualified immunity inquiry.  See, e.g., Wulf, 883 F.2d at 864 (first determining whether the sheriff could be personally liable *before* proceeding into a qualified immunity analysis).  Not surprisingly, Defendants do not argue that a reasonable person would not have known that firing Scott or causing her to be fired because of her gender would violate her clearly established right to equal protection under the Fourteenth Amendment.

underage drinking "possibly involves a matter of public concern." (Defs.' Br., Dkt. No. 51, at 25.)  Whether a particular statement is a matter of public concern is determined by looking at the content, form, and context of the speech.  Wulf, 883 F.2d at 857.  An employee's complaint of discrimination is sometimes a matter of public concern.  Id. at 860; but see Baca, 398 F.3d at 1219 (employee's statements regarding discrimination were not a matter of public concern).  Scott's discrimination claim, however, was only a portion of her statements to the mayor and members of the City Council.  The remainder of her statements centered on her allegations of perceived wrong-doing by Handke, including his alleged condoning of underage drinking, his failure to arrest individuals committing drug crimes in his presence, and his destruction of potential evidence.  Wulf, 883 F.2d at 860 (stating that only a portion of the speech need address a matter of public concern to be protected).  These statements are clearly a matter of public concern.  See Baca, 398 F.3d at 1219 ("statements revealing official impropriety usually involve matters of public concern"); Conaway v. Smith, 853 F.2d 789, 796 (10th Cir. 1988) ("[s]peech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials, in terms of content, clearly concerns matters of public import.").  Accordingly, Scott has established that she engaged in protected speech.

The Court must now weigh Scott's interest in making the speech with her employer's interest in regulating her speech.  The Court is mindful that a police department has a "heightened interest . . . in maintaining discipline and harmony among employees." Wulf, 883 F.2d at 861.  Defendants contend that Scott's speech had the potential for disruption in

the police department.  However, because Scott's termination did not occur until eight or nine months *after* her protected speech, Defendants must show *actual disruption* resulting from the speech.  See Kent v. Martin, 252 F.3d 1141, 1144 (10th Cir. 2001) (where employer fired employee six months after protected speech, employer must demonstrate speech actually disrupted the workplace).  Defendants have not made such a showing.  Thus, the Court resolves this prong in Scott's favor.

The third prong in Scott's First Amendment claim is generally one of fact.  See Baca, 398 F.3d at 1219.  Defendants contend that Scott has not established a genuine issue of material fact regarding whether her protected speech substantially motivated Defendants to terminate her.  Specifically, Defendants point out that eight months lapsed from the time of Scott's protected speech and the time Scott was fired.  Thus, the fact that Scott was fired after engaging in protected speech is not sufficient, alone, to support the inference of a retaliatory motive.  See Butler v. City of Prairie Village, 172 F.3d 736, 746 (10th Cir. 1999).

Scott alleges, however, that Handke, Denard, and the City began to retaliate against her shortly after she presented her complaints about Handke to the City Council.  To support her claim of retaliatory conduct, Scott proffers the following evidence:  (1) Handke denying Scott the opportunity to participate in a CLEET program scheduled for May 2004; (2) Handke leaving Scott a note calling her a "dumb-dumb;" (3) Handke telling his cousin

to tape record all of his conversations with Scott;[7] and (4) the City Council, at Denard's urging, requiring Scott to reimburse the City for her gun purchase.

Scott has presented sufficient evidence that Handke caused her termination in retaliation for her complaints against him to the City Council. The strongest evidence from which a jury could infer Handke's retaliatory motive is his memo calling Scott insubordinate issued within days of her complaints and commanding her to "not go outside the chain of command to complain." (March 11, 2004 memo, Pl.'s Exh. 33.) Handke's March 30, 2004, memorandum requiring officers to get approval to attend CLEET classes was issued within days of Scott telling Handke that she had enrolled in a CLEET class for May 2004. (See March 30, 2004, memo, Pl.'s Exh. 40.) In April, Handke tape-recorded a confrontation with Scott and suspended her. Scott asserts that Handke also told others to tape record their conversations with her as well. Finally, as discussed previously, Handke has testified that he and Denard were in constant communication about Handke's problems with Scott. Thus, Scott has demonstrated a genuine issue of fact regarding whether Handke caused her termination in retaliation for her complaints against him. See Garrett, 305 F.3d at 1221 (noting that a "marked shift in the attitudes and treatment" by his superiors was sufficient evidence of a connection between protected conduct and termination to establish prima facie case of retaliation).

---

[7] The statement by Handke's cousin is clearly hearsay. However, it does not appear that Defendants have objected to its admission. Thus, for purposes of this motion, the Court will consider it for its truth.

Scott has also established a sufficient inference of retaliatory motive on the part of Denard and the City. Two months after Scott engaged in protected speech, the City, at Denard's insistence, required Scott to pay the City back for the purchase of her backup gun. According to Scott, the repayment requirement had not previously been imposed on other officers who had purchased a gun with their uniform and equipment allowance. Although it is questionable whether this action and her subsequent termination six months later together constitute a "pattern of retaliatory conduct," the Court finds that there is sufficient evidence to "'justify an inference of retaliatory motive'" on the part of Denard and the City. See Garrett, 305 F.3d at 1221 (citation omitted). Denard testified that he began thinking of firing Scott in June 2004, two months after she engaged in the protected speech. In addition to the allegedly "selective" enforcement of an unwritten policy regarding permissible uniform and equipment purchases, Scott has presented evidence that (1) several members of the City Council agree that, if true, Handke's actions would constitute dereliction of duty, yet they do not intend to investigate the claims or take any other action thereon; (2) Denard's initial reason for firing Scott and the City's reason for upholding the termination is subject to disbelief, see pretext discussion, supra; (3) at least one member of the City Council testified that part of the motivation to uphold Scott's termination was that she was going to sue the City anyway. Given this evidence, the Court cannot conclude that no reasonable juror could find that Scott's protected speech was a substantial motivating factor behind her termination. See Garrett, 305 F.3d at 1221 (holding "[t]he standard for proving a prima facie case . . . is low); Kendrick, 220 F.3d at 1227 (stating that the plaintiff must simply

27

demonstrate "that the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination'") (quoting <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 245, 253-54 (1981)); <u>Schuler v. City of Boulder</u>, 189 F.3d 1304, 1309-10 (10th Cir. 1999) (stating that "'[a]ctions short of an actual or constructive employment decision can in certain circumstances violate the First Amendment'") (citation omitted). Accordingly, Denard and the City are not entitled to summary judgment on this claim.[8]

CONCLUSION

As explained in more detail above, Defendants' motion for summary judgment (Dkt. No. 50) is GRANTED in part.  Defendants are entitled to summary judgment on Plaintiff's Title VII claims.  In all other aspects, Defendants' motion is DENIED.  A separate judgment on the above claims will be entered at the conclusion of these proceedings.

IT IS SO ORDERED this 25th day of May, 2005.

ROBIN J. CAUTHRON
United States District Judge

---

[8] The Court does not address whether Denard is entitled to qualified immunity because, as mentioned previously, Denard makes no argument other than he did not personally participate in the deprivation of Scott's constitutional rights.  As Denard was the person with the authority to terminate Scott and did indeed terminate her, it is difficult to see how this is a legitimate argument. Further, Defendants do not argue that no reasonable official could have known that firing Scott after complaining of wrongdoing by the chief of police would violate her constitutional right to free speech.